UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| CRYSTAL BRIDGEWATER and ANTHONY BRIDGEWATER, | ) ) | |
| *Plaintiffs*, | ) | |
| | ) | 1:14-cv-01370-JMS-MJD |
| *vs.* | ) | |
| | ) | |
| CITY OF INDIANAPOLIS, DETECTIVE GREGORY KESSIE, and DETECTIVE CHAD OSBORNE, | ) ) | |
| *Defendants*. | ) | |

## ORDER

Presently pending in this civil rights case are: (1) a Motion for Summary Judgment filed by Defendants City of Indianapolis (the "City"), Detective Gregory Kessie, and Detective Chad Osborne, [Filing No. 53]; and (2) a Cross-Motion for Partial Summary Judgment filed by Plaintiffs Crystal Bridgewater and Anthony Bridgewater, [Filing No. 62].

## I.
### STANDARD OF REVIEW

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). As the current version of Rule 56 makes clear, whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). A party can also support a fact by showing that the materials cited do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(B). Affidavits or declarations must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on matters stated. Fed. R. Civ. P. 56(c)(4). Failure

to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision. A disputed fact is material if it might affect the outcome of the suit under the governing law. *Hampton v. Ford Motor Co.*, 561 F.3d 709, 713 (7th Cir. 2009). In other words, while there may be facts that are in dispute, summary judgment is appropriate if those facts are not outcome determinative. *Harper v. Vigilant Ins. Co.*, 433 F.3d 521, 525 (7th Cir. 2005). Fact disputes that are irrelevant to the legal question will not be considered. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L.Ed. 202 (1986).

On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events. *Johnson v. Cambridge Indus.*, 325 F.3d 892, 901 (7th Cir. 2003). The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party. *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009). The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Darst v. Interstate Brands Corp.*, 512 F.3d 903, 907 (7th Cir. 2008). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011). The Court need only consider the cited materials, Fed. R. Civ. P. 56(c)(3), and the Seventh Circuit Court of Appeals has "repeatedly assured the district courts that they are not required to scour every inch of the record for evidence that is potentially relevant to

the summary judgment motion before them," *Johnson*, 325 F.3d at 898.  Any doubt as to the ex-

istence of a genuine issue for trial is resolved against the moving party.  *Ponsetti v. GE Pension*

*Plan*, 614 F.3d 684, 691 (7th Cir. 2010).

"The existence of cross-motions for summary judgment does not, however, imply that there

are no genuine issues of material fact."  *R.J. Corman Derailment Servs., LLC v. Int'l Union of*

*Operating Engineers*, 335 F.3d 643, 647 (7th Cir. 2003).  Specifically, "[p]arties have different

burdens of proof with respect to particular facts; different legal theories will have an effect on

which facts are material; and the process of taking the facts in the light most favorable to the non-

movant, first for one side and then for the other, may highlight the point that neither side has

enough to prevail without a trial."  *Id.* at 648.

## II.
### BACKGROUND

The Court finds the following to be the undisputed facts, as supported by proper citation to

admissible evidence in the record and viewed in the light most favorable to Plaintiffs:

### A.  Detectives Osborne and Kessie

Detective Osborne became a police officer at Indiana University-Purdue University Indi-

anapolis after attending a twelve week police academy in 1998.  [Filing No. 53-1 at 55.]  In Feb-

ruary 2011, he became employed by the Indianapolis Metropolitan Police Department ("IMPD")

and attended a six month police academy.  [Filing No. 53-1 at 55.]  Detective Osborne had been a

narcotics detective with IMPD for seven years when the events giving rise to this lawsuit occurred,

and had participated in "several hundred" controlled narcotics buys per year.  [Filing No. 53-1 at

43-44.]  Detective Osborne has never been disciplined for professional misconduct as a police

officer.  [Filing No. 53-2 at 2.]

Detective Kessie has been employed by IMPD since April 2007, and has been a narcotics detective with IMPD since October 2011. [Filing No. 53-4 at 2.] He graduated from the IMPD training academy in 2007, and has attended numerous training sessions specific to narcotics, including a two-week narcotics school put on by veteran detectives and an annual Indiana Drug Enforcement Agency training conference. [Filing No. 53-3 56.] Detective Kessie estimates that he has conducted or assisted in over 1,000 narcotics investigations, and has worked with over forty confidential informants. [Filing No. 53-4 at 2.] Detective Kessie has never been disciplined as a police officer. [Filing No. 53-3 at 57.]

### B. Controlled Narcotics Buys

A controlled narcotics buy involves undercover police officers and informants purchasing drugs from a drug dealer or criminal enterprise that is the target of a law enforcement investigation. [Filing No. 53-3 at 8-9; Filing No. 53-4 at 3.] A lead detective develops an operational plan for the controlled buy, supervises undercover officers and informants, and assigns tasks to other officers to implement the operational plan and safely recover any evidence or conduct surveillance during the operation. [Filing No. 53-4 at 3.] When the transaction is complete, the narcotics are transported to the IMPD Drug Vault, where chain of custody is established for criminal prosecution. [Filing No. 53-4 at 3.]

Counter-surveillance occurs when the drug dealer, or an associate of the dealer, stalks the potential buyer to determine whether the buyer is a risk – *e.g.*, whether the buyer is actually an undercover officer or confidential informant. [Filing No. 53-4 at 3-4.] Counter-surveillance puts an undercover officer or confidential informant at risk of being killed or seriously injured. [Filing No. 53-4 at 4.] Detective Kessie estimates that counter-surveillance occurs in more than half of controlled buys. [Filing No. 53-4 at 4.] Detective Osborne estimates that he has conducted under

seven investigatory stops in seven years based on reasonable suspicion of counter-surveillance. [Filing No. 53-1 at 44.]  Detective Osborne also estimates that 99% of the suspects they encounter are carrying guns.  [Filing No. 53-1 at 57.]

### C.  The November 6, 2013 Controlled Buy

On November 6, 2013, Detectives Osborne and Kessie were involved in a controlled buy that took place at approximately 3:00 p.m. in the area of East and Orange Streets in the Fountain Square neighborhood of Indianapolis.  [Filing No. 53-3 at 7-8; Filing No. 53-4 at 4.]  They were part of a team of IMPD Southeast Narcotics Unit officers, and were operating in an undercover capacity – they were dressed in civilian clothes instead of uniforms, and were driving an unmarked vehicle.  [Filing No. 53-1 at 39-43; Filing No. 53-3 at 9-10; Filing No. 53-3 at 23-24; Filing No. 53-3 at 49; Filing No. 53-4 at 4.]  Their unmarked vehicle did not have police lights.  [Filing No. 53-1 at 32.]  Detectives Osborne and Kessie were to supervise another undercover officer and a confidential informant while they purchased cocaine from a drug dealer who was the target of the investigation, to coordinate the operation, and to ensure the protection of the undercover officer and the confidential informant.  [Filing No. 53-4 at 4.]

IMPD's Southeast Precinct is located near the area of the controlled buy, and after the buy took place the undercover officer and the confidential information were to return to their unmarked vehicle and deliver the cocaine to the precinct.  [Filing No. 53-3 at 8-9; Filing No. 53-4 at 4.]  This return trip to the precinct took place around 3:30 p.m. on November 6, 2013, and Detectives Osborne and Kessie followed the undercover officer and confidential informant closely behind in an unmarked car, but with one or two cars between them.  [Filing No. 53-3 at 9-14; Filing No. 53-3 at 16.]  Part of the route from the controlled buy to the precinct went east on Morris Street, and

vehicles use the left lane of Morris Street because the right lane of Morris Street yields to residential parking before the traffic light at Morris and Shelby Streets.  [Filing No. 53-4 at 4.]

### D.  The First Encounter Between Detectives Osborne and Kessie and Plaintiffs

While on Morris Street, Detectives Osborne and Kessie noticed a black SUV which they thought was driving aggressively in the right lane and approaching at a high rate of speed.  [Filing No. 53-1 at 18; Filing No. 53-3 at 14-17; Filing No. 53-5 at 7.]  Ms. Bridgewater was driving the SUV and Mr. Bridgewater, her son, was a passenger.  [Filing No. 53-3 at 21; Filing No. 53-3 at 31; Filing No. 53-5 at 15.]  Ms. Bridgewater admits that she was driving above the speed limit.  [Filing No. 53-5 at 7-9.]  Detectives Osborne and Kessie became suspicious that the occupants of the SUV were conducting counter-surveillance on the controlled buy based on the SUV's high rate of speed, use of the right lane (which yields to residential parking), and temporal proximity to the controlled buy.  [Filing No. 53-1 at 8-9; Filing No. 53-3 at 14-15.]  Because both the SUV and the unmarked police car Detectives Osborne and Kessie were traveling in had tinted windows, neither vehicles' occupants could observe who was traveling in the other vehicle as they drove.  [Filing No. 53-4 at 5; Filing No. 53-5 at 11; Filing No. 53-6 at 7.]

Detective Kessie was driving the unmarked police car, and sped up so he could maneuver the car to stay in front of the SUV and prevent it from getting in between Detectives Osborne and Kessie and the vehicle containing the other undercover officer and the confidential informant.  [Filing No. 53-1 at 8-9; Filing No. 53-3 at 14-16; Filing No. 53-5 at 7.]  The SUV, however, continued to speed up to above the posted speed limit and head straight toward vehicles parked in the right lane.  [Filing No. 53-3 at 17-18; Filing No. 53-5 at 7; Filing No. 53-6 at 7-8.]  When it became apparent that Ms. Bridgewater was not going to slow down, Detective Kessie yielded to her and she merged into the left lane in front of Detectives Osborne and Kessie and one or two

vehicles behind the vehicle containing the undercover officer and the confidential informant.  [Filing No. 53-3 at 16-18; Filing No. 53-5 at 9-10; Filing No. 53-6 at 7.]  Both vehicles were then stopped at a traffic light.  [Filing No. 53-3 at 18-19; Filing No. 53-5 at 10; Filing No. 53-6 at 7.] Up to this point, the interaction between the two vehicles had lasted less than one minute.  [Filing No. 53-4 at 5.]

Based on the circumstances, including the SUV driver's apparent determination to get in between the vehicle driven by Detective Kessie and the vehicle containing the undercover officer and the confidential informant, Detectives Osborne and Kessie attempted to conduct an investigatory stop of the SUV at the traffic light.  [Filing No. 53-4 at 5.] They reasoned that this would also give the undercover officer and the confidential informant time to get to the precinct undetected. [Filing No. 53-4 at 5.]  When Plaintiffs stopped at the red light, Detectives Osborne and Kessie exited their vehicle, announced that they were police officers, displayed their police badges and department-issued identification cards, and ordered the occupants of the SUV to roll their windows down and exit the vehicle.  [Filing No. 53-1 at 13; Filing No. 53-3 at 19-21; Filing No. 53-5 at 11-12; Filing No. 53-6 at 9.] Detectives Osborne and Kessie could see that there were two occupants, but could not see whether the occupants were armed, although Detective Osborne did not see any firearms.  [Filing No. 53-1 at 18-20; Filing No. 53-1 at 47; Filing No. 53-3 at 31; Filing No. 53-4 at 5.]

Detective Osborne initially approached the passenger side of the SUV, and Detective Kessie initially approached the driver side of the SUV, but then went to the passenger side.  [Filing No. 53-1 at 9; Filing No. 53-3 at 19-20.] The detectives announced that they were police officers, Detective Osborne showed Ms. Bridgewater his police badge, and Detective Kessie showed Mr. Bridgewater his police badge and police identification.  [Filing No. 53-1 at 9; Filing No. 53-3 at

20; Filing No. 53-5 at 11-12; Filing No. 53-5 at 15; Filing No. 53-6 at 10-11.] The detectives ordered Plaintiffs to get out of the car and roll their windows down. [Filing No. 53-5 at 18-20; Filing No. 53-6 at 9-15; Filing No. 53-6 at 20.] Detectives Osborne and Kessie also banged on the windows of Plaintiffs' SUV and tried to open the doors. [Filing No. 53-6 at 10-15.]

Ms. Bridgewater would not roll down her window. [Filing No. 53-1 at 18; Filing No. 53-3 at 21; Filing No. 53-5 at 14.] Instead, she held up her cell phone and mouthed something about "911." [Filing No. 53-3 at 35-36; Filing No. 53-5 at 11-12; Filing No. 53-6 at 15.] In fact, Ms. Bridgewater had called 911 and stated that she did not know if Detectives Osborne and Kessie were "impersonating as being a cop," that they were "sitting up here showing me badges and stuff," that "they're trying to open my door and being real insubordinate," and that "this is not how cops work." [Filing No. 62-9 at 2.] At some point while Ms. Bridgewater was on the phone with the 911 operator, Detectives Osborne and Kessie drew their guns. [Filing No. 53-5 at 15-16; Filing No. 53-6 at 13; Filing No. 62-2 at 23; Filing No. 62-9.]

Plaintiffs did not believe that Detectives Osborne and Kessie were police officers and, as a result, were scared and concerned for their safety. [Filing No. 53-5 at 16; Filing No. 53-5 at 19; Filing No. 53-6 at 9-11; Filing No. 62-2 at 14; Filing No. 62-2 at 20; Filing No. 62-3 at 21.] Detective Osborne then called over his radio for assistance from a uniformed officer, but when the light turned green, Ms. Bridgewater accelerated the SUV through the intersection and turned left onto Shelby Street. [Filing No. 53-1 at 13; Filing No. 53-1 at 48-49; Filing No. 53-5 at 16.]

The time that passed between Detectives Osborne and Kessie exiting their vehicle and Plaintiffs driving off from the attempted investigatory stop was "only a matter of seconds." [Filing No. 53-4 at 6.] When Plaintiffs fled, Detectives Osborne and Kessie still did not know whether they were connected to the controlled buy. [Filing No. 53-4 at 6.] They did understand, however,

that Plaintiffs may not believe they were police officers. [Filing No. 53-1 at 9; Filing No. 53-1 at 13; Filing No. 53-3 at 35-36.] Detectives Osborne and Kessie remained concerned that Plaintiffs were armed and dangerous, and their concerns grew when Plaintiffs fled from the attempted investigatory stop. [Filing No. 53-4 at 4-6.]

### E.  The Second Encounter Between Detectives Osborne and Kessie and Plaintiffs

After they had driven a short distance, Plaintiffs were stopped by Detectives Osborne and Kessie and Officer Amanda Schaefer, who was driving a marked IMPD squad car. [Filing No. 53-1 at 32-33; Filing No. 53-6 at 17-19.] All three officers drew their weapons, took cover near Officer Schaefer's squad car, and ordered Plaintiffs to exit the SUV. [Filing No. 53-3 at 29-30; Filing No. 53-5 at 21.] The officers took action pursuant to IMPD's policies and procedures for felony traffic stops, which maximize officer safety in potentially dangerous encounters. [Filing No. 53-3 at 29-30.]

Ms. Bridgewater immediately complied with the officers' instructions, and was handcuffed without incident. [Filing No. 53-3 at 32; Filing No. 53-5 at 22-25.] Mr. Bridgewater, however, did not exit the vehicle so Detective Osborne opened Mr. Bridgewater's door and tried to forcibly remove him with his seatbelt still buckled. [Filing No. 53-1 at 15; Filing No. 53-6 at 22-24.] Mr. Bridgewater then unbuckled his seatbelt, and Detective Osborne removed him from the vehicle in a "head first" position, placed him in the prone position, and placed Mr. Bridgewater's hands behind his back. [Filing No. 53-1 at 15; Filing No. 53-1 at 20-22; Filing No. 53-6 at 22-26.] Detective Osborne applied pressure to Mr. Bridgewater's back while he was on the ground, handcuffed Mr. Bridgewater, picked him up, and moved him to the sidewalk. [Filing No. 53-1 at 22; Filing No. 53-6 at 25-26.] Mr. Bridgewater was not physically resisting. [Filing No. 53-1 at 20-21;

Filing No. 53-6 at 25-26.]  Plaintiffs were unarmed, and were not involved in the controlled buy. [Filing No. 53-1 at 19-20; Filing No. 53-3 at 41; Filing No. 62-1 at 5-6; Filing No. 62-2 at 27.]

Sometime during the encounter, Sergeant John Baker from IMPD's Southeast District walked to the scene from the precinct.  [Filing No. 53-1 at 23-25; Filing No. 53-3 at 40; Filing No. 53-6 at 30.]  After speaking with Plaintiffs, the officers were satisfied that Plaintiffs were not involved in the controlled buy and released them; they were not arrested, cited, or summoned to appear in court because the purpose of the attempted investigatory stop was to determine whether they were connected to the controlled buy.  [Filing No. 53-1 at 26; Filing No. 53-2 at 4; Filing No. 53-3 at 40-41; Filing No. 53-6 at 31-32.]

**F.  Mr. Bridgewater's Injuries**

Later that same day, after going to work for a short period of time, Mr. Bridgewater went to the emergency department at Eskenazi Health for back pain and a headache.  [Filing No. 62-3 at 4-6; Filing No. 62-10.]  Mr. Bridgewater had several follow-up visits for back pain, and was referred to and received physical therapy services for his back pain.  [Filing No. 62-3 at 5; Filing No. 64 at 3-6.]  Mr. Bridgewater also reported during his follow-up visits that he was suffering from nightmares and trouble sleeping, and was bothered by police brutality and shootings.  [Filing No. 62-3 at 12-13; Filing No. 64 at 4.]  Mr. Bridgewater has also received treatment for post-traumatic stress disorder.  [Filing No. 62-3 at 8-11; Filing No. 64 at 5.]

**G.  The Lawsuit**

Plaintiffs filed a Complaint against Detectives Osborne and Kessie and the City on August 19, 2014.  [Filing No. 1.]  In a November 4, 2015 Joint Stipulation as to Certain Claims and Counts, the parties clarified the claims that remain pending in this action, which include: (1) use of exces-

sive force, pursuant to 42 U.S.C. § 1983, brought only by Mr. Bridgewater against Detective Osborne in his individual capacity; (2) false imprisonment under state law by both Plaintiffs against the City; (3) battery under state law by Mr. Bridgewater against the City; (4) false arrest/unlawful stop and search pursuant to 42 U.S.C. § 1983 and the Fourth Amendment by both Plaintiffs against Detectives Osborne and Kessie in their individual capacities; and (5) intentional infliction of emotional distress under state law by both Plaintiffs against the City.  [Filing No. 51.]

Detectives Osborne and Kessie and the City filed their Motion for Summary Judgment on December 7, 2015 requesting summary judgment on all of Plaintiffs' claims, [Filing No. 53], and Plaintiffs filed a Cross-Motion for Partial Summary Judgment on January 8, 2016 requesting summary judgment on their claims for false imprisonment against the City and for false arrest/unlawful stop and search pursuant to 42 U.S.C. § 1983 against Detectives Osborne and Kessie in their individual capacities, [Filing No. 62].  The Court now considers the pending motions.  The Court notes that Plaintiffs abandoned their intentional infliction of emotional distress claim during briefing, so the Court will grant summary judgment in favor of the City on that claim.  [*See* Filing No. 65 at 48 ("The Bridgewaters, upon further review of the law as it applies to the facts, concedes to Defendants' arguments as to intentional infliction of emotional distress.  Therefore, judgment should be entered in favor of Defendants on Count 6 for intentional infliction of emotional distress").]

### III.
#### DISCUSSION

The parties discuss Plaintiffs' claims and their arguments for and against summary judgment in different orders in their briefs, which has made the Court's review of the motions unnecessarily cumbersome.  Nevertheless, the Court has done its best to match up the parties' arguments, and discusses Plaintiffs' claims in an order that coincides roughly with the chronology of events.

### A.  Unlawful Stop and Search Under 42 U.S.C. § 1983 and the Fourth Amendment

The Court will evaluate Plaintiffs' § 1983 unlawful stop and search claim first, and then turn to their state law claim for false imprisonment.  In evaluating the constitutionality of Defendants' conduct, the Court must "carve up the incident into segments and judge each on its own terms to see if the officer[s] w[ere] reasonable at each stage." *Deering v. Reich*, 183 F.3d 645, 652 (7th Cir. 1999) (citation and quotation marks omitted).[1]  Therefore, the Court must determine first whether "a seizure occurred," and if it did, whether "that seizure meets Fourth Amendment standards," *Baird v. Renbarger*, 576 F.3d 340, 344 (7th Cir. 2009), and whether the seizure violates clearly established law, *Miller v. Harbaugh*, 698 F.3d 956, 962 (7th Cir. 2012).

#### 1.  *The Initial Encounter*

Plaintiffs allege that Detectives Osborne and Kessie, in their individual capacities, violated their Fourth Amendment rights by unlawfully stopping and seizing them during the first encounter. In support of their Motion for Summary Judgment, Defendants argue that Detectives Osborne and Kessie had reasonable suspicion to conduct an investigatory stop when they approached Plaintiffs' SUV while stopped at the light at Morris and Shelby Streets because they believed, based on Ms. Bridgewater's actions while driving, that Plaintiffs were engaged in counter-surveillance related to the controlled buy.  [Filing No. 54 at 12-15.]  Defendants claim that, in any event, Plaintiffs were not seized at the initial encounter because they did not submit to the Detectives' authority but instead fled the scene.  [Filing No. 54 at 15-16.]  Detectives Osborne and Kessie also assert

---

[1] The Court notes that counsel on both sides of this case frequently appear in the Southern District, and frequently litigate § 1983 and Fourth Amendment claims.  In further cases, they should ensure that their arguments apply relevant Seventh Circuit authority, such as the *Deering* case cited above.

that they are entitled to qualified immunity for their actions, because those actions did not violate clearly established law.  [Filing No. 54 at 18-20.]

In response, and in support of their Cross-Motion for Partial Summary Judgment, Plaintiffs argue that Defendants did not have the authority to conduct an investigatory stop under Indiana Code § 9-30-2-2, which provides that a law enforcement officer cannot arrest or issue a traffic information and summons for violation of an Indiana law regulating the use of a motor vehicle unless the officer is wearing a uniform or operating a marked car.  [Filing No. 65 at 19-24.]  Further, Plaintiffs argue that Defendants did not have reasonable suspicion to conduct an investigatory stop because they cannot point to any underlying crime the Bridgewaters committed or were about to commit, and the speed of their SUV and their use of the right lane are inadmissible and, in any event, are not sufficient to support a reasonable suspicion.  [Filing No. 65 at 29-33.]  Plaintiffs contend that they were seized during the investigatory stop because Defendants made a show of authority, drew their firearms, were trying to open doors and banging windows, and Plaintiffs submitted to their show of authority.  [Filing No. 65 at 33-37.]  Plaintiffs argue that Defendants initiated the traffic stop by letting Plaintiffs pull in front of them, and that they did not drive off until the traffic light changed.  [Filing No. 65 at 37.]  They assert that Defendants exerted physical force while they were stopped by banging and trying to open the doors to the SUV.  [Filing No. 65 at 37-38.]  They argue that a reasonable person would not have believed they were free to leave the investigatory stop.  [Filing No. 65 at 38.]  Finally, Plaintiffs argue that Defendants are not entitled to qualified immunity for false arrest because a reasonably prudent officer would know that initiating an investigatory stop while not in uniform and driving an unmarked vehicle violates Indiana Code.  [Filing No. 65 at 42.]

On reply, Defendants argue that Indiana Code § 9-30-2-2 is irrelevant to a Fourth Amendment analysis, and that it does not apply to investigatory stops based on reasonable suspicion of criminal activity. [Filing No. 68 at 7-9.] They also assert that Plaintiffs have not established that Defendants' actions violated any clearly established constitutional right, and so they are entitled to qualified immunity. [Filing No. 68 at 9-14.]

In their reply, Plaintiffs argue that they were unarmed, and Defendants' belief otherwise was unreasonable. [Filing No. 69 at 1-2.] They also reiterate their argument that they were falsely imprisoned. [Filing No. 69 at 3-4.]

Plaintiffs bring their unlawful stop and search claim under § 1983, which requires them to demonstrate: "(1) that [they were] deprived of a right secured by the Constitution or laws of the United States, and (2) that the deprivation was visited upon [them] by a person or persons acting under color of state law." *Reynolds v. Jamison*, 488 F.3d 756, 764 (7th Cir. 2007) (quoting *Kramer v. Village of North Fond du Lac*, 384 F.3d 856, 861 (7th Cir. 2004) (quotation marks omitted)). A roadside traffic stop may constitute a "seizure" under the Fourth Amendment. *Elliot v. Sheriff of Rush Co., Ind.*, 686 F.Supp.2d 840, 853 (S.D. Ind. 2010). Police may make a stop under *Terry v. Ohio*, 392 U.S. 1 (1968), when they have reasonable suspicion to believe that an individual has violated the law. A *Terry* stop is proper when police have reasonable suspicion to believe that an individual has violated even a minor traffic law. *United States v. McDonald*, 453 F.3d 958, 960 (7th Cir. 2006) (citing *Whren v. United States*, 517 U.S. 806, 810 (1996)).

The Court's "first task is to ascertain the point at which Fourth Amendment concerns became implicated." *United States v. Ford*, 333 F.3d 839, 844 (7th Cir. 2003). As the Seventh Circuit Court of Appeals has explained:

The Supreme Court [has] applied a two-part test to decide whether a person [has] been seized such that Fourth Amendment protections are triggered (whether that

seizure be an arrest, a *Terry* stop, or otherwise): first, determine whether any physical force simultaneously accompanied the officer's show of authority, and second, determine whether the defendant failed to comply with that show of authority. If no physical force accompanied the show of authority and a person chose to ignore or reject that show of authority, the defendant is not seized until the officer applied physical force and the person submitted to the officer's show of authority….[U]nder this test, a fleeing suspect – even one who is confronted with an obvious show of authority – is not seized until his freedom of movement is terminated by intentional application of physical force or by the suspect's submission to the asserted authority.

*Ford*, 333 F.3d at 844 (quoting *United States v. $32,400.00, in United States Currency*, 82 F.3d 135, 138-39 (7th Cir. 1996)); *see also United States v. Griffin*, 652 F.3d 793, 798 (7th Cir. 2011) ("[A] person is seized only when, by means of physical force or a show of authority, his freedom of movement is restrained. While an officer's application of physical force always constitutes a seizure, a 'show of authority' alone is insufficient; an officer's show of authority becomes a seizure only if the person at whom it is directed actually submits to that authority. In other words, there are two kinds of seizures: those effected through physical force and those effected through a show of authority and submission to the assertion of authority") (citations and emphasis omitted).

A "'seizure is a single act, and not a continuous fact.'" *Id.* at 799. Thus, if a person does not submit to an officer's initial "show of authority," "the seizure does not occur until he submits to the show of authority or the pursuing officer resorts to force." *Id.* at 799-800. Submission is a fact-sensitive inquiry. *See Brendlin v. California*, 551 U.S. 249, 262 (2007) ("But what may amount to submission depends on what a person was doing before the show of authority: a fleeing man is not seized until he is physically overpowered, but one sitting in a chair may submit to authority by not getting up to run away"). A person who briefly stops before continuing on does not submit. *$32,400.00, in United States Currency*, 82 F.3d at 138-39; *see also United States v. Mosley*, 743 F.3d 1317, 1325 (10th Cir. 2014) ("[T]o comply with an order to stop – and thus to

become seized – a suspect must do more than halt temporarily; he must submit to police author-
ity").

Although whether a seizure has occurred is a fact-sensitive inquiry, the relevant facts re-
garding what happened at the initial stop in this case are straightforward and undisputed:  Detec-
tives Osborne and Kessie attempted an investigatory *Terry* stop, but did so only by approaching
Plaintiffs' car after it had already stopped for a red light.   The detectives certainly displayed a
show of force, but the Plaintiffs obeyed none of their instructions and after the brief encounter,
and when the light turned green, Plaintiffs fled.  This first encounter was not a "stop," and so no
seizure occurred.

The reasons why Plaintiffs fled – *e.g.*, that they did not know if Detectives Osborne and
Kessie were police officers – are irrelevant.  Plaintiffs argue that "a reasonable person would have
believed that they were not free to leave," [Filing No. 65 at 37], but the fact remains that Plaintiffs
did leave.  Moreover, Plaintiffs did not stop due to any actions by Detectives Osborne and Kessie.
They stopped because the traffic light was red, refused to follow all instructions while there was
interaction, and then fled after the light turned green.  If Plaintiffs did not submit to the show of
authority, "there is at most an attempted seizure, so far as the Fourth Amendment is concerned."
*Brendlin*, 551 at 254 ("A police officer may make a seizure by a show of authority and without the
use of physical force, but there is no seizure without actual submission"); *accord California v.
Hodari D.*, 499 U.S. 621, 626-27 (1991); *Abbott v. Sangamon County, Ill.*, 705 F.3d 706, 719 (7th
Cir. 2013).

Additionally, while it is undisputed that Detectives Osborne and Kessie banged on the
SUV's windows, tried to open the doors, and drew their guns at some point during this first en-
counter, even if these actions are considered physical force, they do not make the encounter a

seizure because they did not respond to the detectives' commands, and ultimately Plaintiffs fled. *See Price v. Marion County Sheriff's Dept.*, 2013 WL 5321260, *6 (S.D. Ind. 2013) ("No seizure occurs, however, if an officer's show of force does not either physically touch the individual or compel him to submit to the officer's authority") (citing *Hodari D.*, 499 U.S. at 626-27); *$32,400.00, in U.S. Currency*, 82 F.3d at 139 (no seizure occurred where officers surrounded vehicle but driver fled because officers' actions were nothing more than a "strong but unsuccessful attempt to stop [the driver]"). There simply was no stop, no seizure and, consequently, no deprivation of Plaintiffs' Fourth Amendment rights. *Griffin*, 652 F.3d at 799-800.

In the alternative, even if the first encounter could be construed as a stop and seizure, the Court finds that it was lawful. Plaintiffs argue that Indiana Code § 9-30-2-2 precluded the detectives from initiating the encounter, but the Court rejects that argument.[2] The United States Supreme Court explained that it would not consider a state statute similar to § 9-30-2-2 in analyzing a defendant's motion to suppress evidence obtained by plain-clothed officers driving an unmarked car, stating:

> [P]olice enforcement practices, even if they could be practicably assessed by a judge, vary from place to place and from time to time. We cannot accept that the search and seizure protections of the Fourth Amendment are so variable, and can be made to turn upon such trivialities. The difficulty is illustrated by petitioners' arguments in this case. Their claim that a reasonable officer would not have made this stop is based largely on District of Columbia police regulations which permit plainclothes officers in unmarked vehicles to enforce traffic laws "only in case of a

---

[2] Indiana Code § 9-30-2-2 provides: "A law enforcement officer may not arrest or issue a traffic information and summons to a person for a violation of an Indiana law regulating the use and operation of a motor vehicle on an Indiana highway or an ordinance of a city or town regulating the use and operation of a motor vehicle on an Indiana highway unless at the time of the arrest the officer is: (1) wearing a distinctive uniform and a badge of authority; or (2) operating a motor vehicle that is clearly marked as a police vehicle; that will clearly show the officer or the officer's vehicle to casual observations to be an officer or a police vehicle. This section does not apply to an officer making an arrest when there is a uniformed officer present at the time of the arrest."

violation that is so grave as to pose an immediate threat to the safety of others." This basis of invalidation would not apply in jurisdictions that had a different practice. And it would not have applied even in the District of Columbia, if [the officer] had been wearing a uniform or patrolling in a marked police cruiser.

*Whren v. U.S.*, 517 U.S. 806, 815 (1996) (internal citations and emphasis omitted). *See also Virginia v. Moore*, 553 U.S. 164, 176 (2008) ("while States are free to regulate [warrantless arrests] however they desire, state restrictions do not alter the Fourth Amendment's protections"). Because state regulations related to the detectives' attempt to conduct the first encounter are irrelevant to a Fourth Amendment analysis, the Court rejects Plaintiffs' argument that § 9-30-2-2 affected the constitutionality of the first encounter.

Further, § 9-30-2-2 does not apply to the first encounter, because: (1) it only applies to an arrest or investigatory stop, *Davis v. State*, 858 N.E.2d 168, 172 (Ind. Ct. App. 2006), and the Court has found that there was no "stop" during the first encounter; and (2) it only applies to stops based on a "violation of an Indiana law regulating the use and operation of a motor vehicle." Detectives Osborne and Kessie initiated the first encounter for the additional reason that they believed Plaintiffs might be involved in illegal drug activity, s*ee Thompson v. State*, 702 N.E.2d 1129, 1131-32 (Ind. Ct. App. 1998) (§ 9-30-2-2 did not prohibit plain-clothed officer driving unmarked car from conducting investigatory stop for criminal recklessness because "[t]he criminal recklessness statute is not a law regulating the use and operation of a motor vehicle").

In arguing that suspecting counter-surveillance was not enough to justify initiating the first encounter, Plaintiffs rely upon *Bovie v. State*, 760 N.E.2d 1195 (Ind. Ct. App. 2002). [*See* Filing No. 65 at 26-28.] In *Bovie*, an officer saw two individuals leave a known drug house, proceed to a gas station, and stop their vehicle. *Id.* at 1198. The vehicle the individuals were driving also had a headlight that was not working. *Id.* at 1197. The officer was driving an unmarked car, and initiated an investigatory stop. *Id.* The Court found that the investigatory stop was invalid because

§ 9-30-2-2 prohibited the officer from making the stop for the headlight violation while in an unmarked car and because the remaining ground for the stop – observing the individuals leaving a known drug house – did not provide reasonable suspicion for the stop. *Id*. at 1198. The court concluded that the facts were not enough to "rise to the level of the reasonable and articulable suspicion required in order to make an investigatory stop," but indicated that the officer simply had a "hunch" which "is not sufficient to authorize an investigatory stop." *Id*.

*Bovie* is distinguishable from this case for several reasons. First, it did not involve a federal court evaluating a § 1983 claim, but rather dealt with a defendant's appeal of the state trial court's revocation of his probation. The Court has already found that § 9-30-2-2 has no bearing on the constitutionality of the first encounter. Ms. Bridgewater admits that she was speeding, [Filing No. 53-5 at 7-9], and this alone was enough to give Detectives Osborne and Kessie reasonable suspicion to initiate the first encounter. Additionally, *Bovie* differs significantly from this case because it involved a single stop for a broken headlight and suspicion of criminal activity based on the suspect exiting a known drug house. The Court reiterates that probable cause is judged by whether a reasonable person would think a crime was committed, not by whether a crime was actually committed. *See Venson*, 749 F.3d at 649; *Huff*, 744 F.3d at 1007. Detectives Osborne and Kessie were faced with a fluid situation that took place over just a few minutes. They observed Ms. Bridgewater driving over the speed limit, in a lane that would require her to quickly yield into their lane, and believed she was trying to place the SUV in between their vehicle and the vehicle containing the undercover officer and the confidential informant. The totality of these circumstances supported the detectives' initiation of the first encounter.

The first encounter was not a stop and no seizure occurred, but even if it could be construed as such, Detectives Osborne and Kessie had reasonable suspicion to initiate the first encounter.

Plaintiffs' unlawful stop and search claim under § 1983 against Detectives Osborne and Kessie related to the first encounter fails as a matter of law.

### 2.   *The Second Encounter*

Defendants argue that Detectives Osborne and Kessie had probable cause to pursue Plaintiffs when they fled the attempted investigatory stop because they believed Plaintiffs were resisting law enforcement under Indiana Code § 35-44-1-3-1(a).  [Filing No. 54 at 16-18.] They also assert that they are entitled to qualified immunity for their actions generally, although they do not specifically address the second encounter.  [Filing No. 54 at 18-20.]

Plaintiffs respond that Defendants did not have probable cause to arrest or detain them at the second stop because they did not resist law enforcement since Defendants were prohibited from making the investigatory stop under Indiana Code § 9-30-2-2, and since Plaintiffs did not believe Detectives Osborne and Kessie were police officers.  [Filing No. 65 at 40-41.]  Plaintiffs do not specifically address whether Defendants are entitled to qualified immunity in connection with the second encounter.  [*See* Filing No. 65 at 42-43.]

On reply, Defendants do not address the second encounter, [*see* Filing No. 68], and in their final reply, Plaintiffs contend that they did not resist law enforcement, and that § 9-30-2-2 is just one basis for finding their Fourth Amendment rights were violated, among others identified by Plaintiffs, [Filing No. 69 at 2-3].

Defendants do not dispute that their second stop of Plaintiffs, after they fled the initial stop, constituted a seizure and the Court agrees that this is the case.  *See Heien v. North Carolina*, 135 S.Ct. 530, 536 (2014) ("A traffic stop for a suspected violation of law is a 'seizure' of the occupants of the vehicle and therefore must be conducted in accordance with the Fourth Amendment").  Accordingly, the Court will consider whether the second stop constituted an unlawful seizure.

In order to succeed on a false arrest claim under § 1983, Plaintiffs must show that they were seized without probable cause.  *Gonzalez v. City of Elgin*, 578 F.3d 526, 537 (7th Cir. 2009); *Bugariu v. Town of St. John, Ind.*, 2014 WL 958025, *3 (N.D. Ind. 2014) ("The big question in a false arrest claim under…federal law is whether the defendant had probable cause for the arrest").  Probable cause is "an absolute defense to a wrongful arrest under [42 U.S.C. §] 1983."  *Rooni v. Biser*, 742 F.3d 737, 740 (7th Cir. 2014).

"Probable cause to make an arrest exists when a reasonable person confronted with the sum total of facts known to the officer at the time of the arrest would conclude that the person arrested has committed, is committing, or is about to commit a crime."  *Venson v. Altamirano*, 749 F.3d 641, 649 (7th Cir. 2014); *see also Huff v. Reichert*, 744 F.3d 999, 1007 (7th Cir. 2014) ("Probable cause exists when 'the facts and circumstances within [the officer's] knowledge and of which they have reasonably trustworthy information are sufficient to warrant a prudent person in believing that the suspect had committed an offense'").  Probable cause "is a fluid concept that relies on the common-sense judgment of the officers based on the totality of the circumstances."  *United States v. Reed*, 443 F.3d 600, 603 (7th Cir. 2006).  Courts "'step into the shoes of a reasonable person in the position of the officer,' considering the facts known to the officer at the time [but] do not consider the subjective motivations of the officer."  *Thayer v. Chiczewski*, 705 F.3d 237, 247 (7th Cir. 2012) (citations omitted).

Detectives Osborne and Kessie argue that their initial reasonable suspicion ripened into probable cause when Plaintiffs fled the initial stop, and that fleeing constituted a violation of Indiana Code § 35-44-1-3-1(a).  [Filing No. 54 at 16-17.]  Plaintiffs argue that Detectives Osborne and Kessie did not have probable cause to make the second stop because: (1) they did not resist law enforcement by fleeing the initial stop since the initial stop was invalid under Indiana Code § 9-

30-2-2; (2) there was not reasonable suspicion to believe Plaintiffs were committing a crime (*e.g.*, suspicion that they were conducting counter-surveillance is not sufficient to support reasonable suspicion); and (3) they could not have knowingly and intentionally fled law enforcement because they did not know that Detectives Osborne and Kessie were police officers.  [Filing No. 65 at 26-29; Filing No. 65 at 40-41.]

Indiana Code § 35-44-1-3-1(a) provides that:

(a)  A person who knowingly or intentionally:

 (1) forcibly resists, obstructs, or interferes with a law enforcement officer or a person assisting the officer while the officer is lawfully engaged in the ex-ecution of the officer's duties; [or]

*              *              *

 (3)  flees from a law enforcement officer after the officer has, by visible or audible means, including operation of the law enforcement officer's siren or emergency lights, identified himself or herself and ordered the person to stop;

commits resisting law enforcement, a Class A misdemeanor, except…

(b)  The offense under subsection (a) is a:

(1) Level 6 felony if:

(A) the offense is described in subsection (a)(3) and the person uses a vehicle to commit the offense….

Under Indiana law, § 35-44.1-3-1 is "construed to require that a law enforcement officer's order to stop be based on reasonable suspicion or probable cause."  *Gaddie v. State*, 10 N.E.2d 1249, 1255 (Ind. 2014).

The Court has already rejected Plaintiffs' arguments that Indiana Code § 9-30-2-2 prohib-ited the detectives from initiating the first encounter and that the detectives did not have reasonable suspicion to initiate the first encounter.  As to Plaintiffs' argument that they could not have violated § 35-44.1-3-1 because they did not believe Detectives Osborne and Kessie were police officers,

- 22 -

Plaintiffs' subjective belief is irrelevant to the constitutional analysis. Although "[a] police officer may not ignore conclusively established evidence of the existence of an affirmative defense" to the crime for which they are stopping the defendant, *Hodgkins ex rel. Hodgkins v. Peterson*, 355 F.3d 1048, 1061 (7th Cir. 2004), the fact that Detectives Osborne and Kessie may have understood that there was a possibility Plaintiffs did not believe they were police officers does not change the Court's analysis. Based on the circumstances – including the proximity in time and distance to the controlled buy, Ms. Bridgewater's erratic driving, the inability to identify Plaintiffs or determine whether they were armed, the fact that the detectives identified themselves as police officers, and Plaintiffs' refusal to comply with the detectives' directions to get out of the car during the first encounter – the Court finds that a reasonable officer in the detectives' position could have concluded that Plaintiffs were resisting law enforcement by fleeing the first encounter. Whether or not Plaintiffs were legally guilty of resisting law enforcement under the nuances of Indiana Code § 35-44-1-3-1 is irrelevant. The circumstances were enough to cause a reasonable person to conclude that they probably were. *See U.S. v. Sawyer*, 224 F.3d 675, 679 (7th Cir. 2000) ("So long as the totality of the circumstances, viewed in a common sense manner, reveals a probability or substantial chance of criminal activity on the suspect's part, probable cause exists").

Additionally, the Court notes that even if there was not actual probable cause to stop Plaintiffs the second time, there was at least "arguable probable cause" to pull them over after fleeing from the first encounter such that Detectives Osborne and Kessie are entitled to qualified immunity from Plaintiffs' unlawful stop and search claim. *See Gutierrez v. Kermon*, 722 F.3d 1003, 1008 (7th Cir. 2013) ("qualified immunity provides shelter for officers who have 'arguable probable cause' to arrest – i.e., those officers that reasonably but mistakenly believe they have probable cause").

Because Detectives Osborne and Kessie had probable cause, or at least arguable probable cause, to make the second stop, Plaintiffs' § 1983 claim for unlawful stop and search based on the second stop fails as a matter of law and Detectives Osborne and Kessie are entitled to summary judgment on that claim.

### B.  State Law Claim for False Imprisonment

Plaintiffs assert their state law claim for false imprisonment only against the City, but based on the actions of Detectives Osborne and Kessie in connection with the first and second encounters.  The parties rely upon the same arguments they relied upon in connection with Plaintiffs' § 1983 unlawful stop and search claim.  The Court need not address this claim at length, as its conclusions above foreclose Plaintiffs' claim.

As to the first encounter, the Court has already found that no stop took place.  Therefore, there was no "imprisonment" or restriction on Plaintiffs' movements to support a false imprisonment claim.  *See Miller v. City of Anderson*, 777 N.E.2d 1100, 1104 (Ind. Ct. App. 2002) ("[f]alse imprisonment is the unlawful restraint upon one's freedom of movement or the deprivation of ones liberty without consent").

As to the second encounter, the Court notes that "[i]f a defendant has probable cause to arrest the plaintiff or reasonable suspicion to make a *Terry* stop, or if the plaintiff cannot show an absence of probable cause or reasonable suspicion, then the plaintiff's false imprisonment claim fails." *Alexander v. Doe*, 2003 WL 22244782, *10 (S.D. Ind. 2003).  Because the Court has already concluded that Detectives Osborne and Kessie had probable cause to make the second stop, Plaintiffs' state law claim for false imprisonment related to the second stop fails as a matter of law.

The Court grants the City's Motion for Summary Judgment – and denies Plaintiffs' Cross Motion for Summary Judgment – on Plaintiffs' state law false imprisonment claim.

### C.  Use of Excessive Force in Violation of § 1983

Mr. Bridgewater asserts a claim for use of excessive force in violation of § 1983 against Detective Osborne, related to Detective Osborne's contact with Mr. Bridgewater at the second stop.  In support of his Motion for Summary Judgment, Detective Osborne argues that his use of force was a reasonable response to Mr. Bridgewater's actions, which included fleeing the first encounter and ignoring Detective Osborne's orders.  [Filing No. 54 at 20.]  Detective Osborne contends that he was in a dangerous situation, and that Mr. Bridgewater's flight from the first encounter "only exacerbated the situation by confirming the officers' suspicions and fears that Plaintiffs posed an immediate threat to their safety."  [Filing No. 54 at 22-23.]  Detective Osborne acknowledges that "[t]he facts surrounding the degree of force used by Detective Osborne to re-move Anthony Bridgewater from the vehicle and place him in handcuffs are in dispute," including "(1) whether Anthony informed Detective Osborne that he could not get his seatbelt off; and (2) whether Detective Osborne 'slammed' Anthony to the ground 'chin first.'"  [Filing No. 54 at 23.] He argues that even if the facts are true, the force he used was still reasonable.  [Filing No. 54 at 23-24.]  Detective Osborne also argues that he is entitled to qualified immunity because his actions did not violate clearly established law.  [Filing No. 54 at 24-25.]

In response, Mr. Bridgewater argues that there are disputes of fact and that, when those facts are construed in his favor, they show that Detective Osborne used excessive force.  [Filing No. 65 at 43-45.]  Mr. Bridgewater asserts that the facts show he did not commit any crime, there was no evidence he posed a threat to Defendants, his actions were not violent or serious, and he did not resist arrest.  [Filing No. 65 at 45.]  Mr. Bridgewater also argues that Detective Osborne is not entitled to qualified immunity because his use of excessive force was unconstitutional.  [Filing No. 65 at 46-48.]

On reply, Detective Osborne reiterates his argument that he is entitled to qualified immunity, stating that he was not on notice that "the alleged use of force was excessive as applied to: a potentially-armed suspect; who had just fled an investigatory stop based on an undercover controlled buy of cocaine; and who failed to exit the vehicle when ordered to once the vehicle was stopped again moments later." [Filing No. 68 at 14-15.]

In his reply, Mr. Bridgewater argues that he incurred severe back pain and a headache as a result of Detective Osborne's use of force, and has also had symptoms of post-traumatic stress disorder. [Filing No. 69 at 3.]

### 1. Whether Detective Osborne Used Excessive Force

A claim that an officer used excessive force in seizing an individual is "analyzed under the Fourth Amendment's 'objective reasonableness' standard." Graham v. Connor, 490 U.S. 386, 388 (1989). "[T]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application." Id. at 396 (citations and internal quotation marks omitted). Factors relevant to the inquiry include "'[1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight.'" Baird, 576 F.3d at 344 (alterations in original) (quoting Graham, 490 U.S. at 396). "The dispositive question is whether, in light of the facts and circumstances that confronted the officer (and not 20/20 hindsight), the officer behaved in an objectively reasonable manner." Padula v. Leimbach, 656 F.3d 595, 602 (7th Cir. 2011) (citation and internal quotation marks omitted). This requires "a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." Phillips v. Community Ins. Corp., 678 F.3d 513, 519 (7th Cir. 2012) (quoting Graham, 490 U.S. at 396) (internal quotation marks omitted).

An officer's use of force is "judg[ed] from the totality of the circumstances at the time of the [seizure]." *Fitzgerald v. Santoro*, 707 F.3d 725, 733 (7th Cir. 2013) (alterations in original) (citation and internal quotation marks omitted).  In analyzing whether an officer's force was reasonable under the circumstances, the Court must "remain cognizant of 'the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation.'" *Abbott*, 705 F.3d at 724 (quoting *Graham*, 490 U.S. at 397).  The Court must therefore give "considerable leeway to law enforcement officers' assessments about the appropriate use of force in dangerous situations." *Baird*, 576 F.3d at 342.  "'[W]hen material facts (or enough of them to justify the conduct objectively) are undisputed, then there would be nothing for a jury to do *except* second-guess the officers,'" therefore, "[i]n this situation…the reasonableness of the force used is a legal question." *Cyrus v. Town of Mukwonago*, 624 F.3d 856, 862 (7th Cir. 2010) (emphasis in original) (quoting *Bell v. Irwin*, 321 F.3d 637, 640 (7th Cir. 2003)).  "Plaintiffs need not show physical injury in order to sustain an excessive force claim," as "an arrest can be effectuated by the slightest application of physical force, or by some other show of authority." *Baird*, 576 F.3d at 344 (citing *Hodari D.*, 499 U.S. at 625).

As Detective Osborne acknowledges, the facts related to the use of force against Mr. Bridgewater are disputed.  Detective Osborne claims that Mr. Bridgewater disregarded two orders to exit the SUV, so he opened Mr. Bridgewater's door, unbuckled his seatbelt, removed him from the SUV, placed him in the prone position on the sidewalk, and handcuffed him.  [Filing No. 54 at 9.]  Mr. Bridgewater claims that Detective Osborne attempted to remove him from the SUV while his seatbelt was still fastened, that he unbuckled his own seatbelt, that Detective Osborne forced him to the ground "head first" into the prone position and put his hands behind his back, that

Detective Osborne applied pressure to his back while he was on the ground, and that Detective Osborne then handcuffed him.  [Filing No. 65 at 18.]

Under Mr. Bridgewater's version of the facts, which the Court must accept as true at the summary judgment stage, the Court cannot conclude as a matter of law that no reasonable jury could find Detective Osborne used excessive force.  While the two accounts of what happened when Detective Osborne removed Mr. Bridgewater from the SUV do not differ significantly in terms of the events that occurred, they do differ in terms of the degree of force used.  Mr. Bridgewater claims that he was "forced" to the ground "head first" and that Detective Osborne applied pressure to his back.  Taking Mr. Bridgewater's version of the facts as true, the Court cannot determine that Detective Osborne used reasonable force as a matter of law.  *See Abdullahi v. City of Madison*, 423 F.3d 763, 771 (7th Cir. 2005) ("The reasonableness of kneeling on a prone individual's back during the arrest turns, at least in part, on how much force is applied.  Kneeling with just enough force to prevent an individual from 'squirming' or escaping might be eminently reasonable, while dropping down on an individual or applying one's full weight (particularly if one is heavy) could actually cause death").

The Court recognizes that Detective Osborne faced a fluid situation, that Plaintiffs had fled the first encounter, and that Detective Osborne still did not know whether Plaintiffs were involved in counter-surveillance for the controlled drug buy when he removed Mr. Bridgewater from the SUV.  But the Court also notes that Mr. Bridgewater was contained in the SUV, was in the passenger seat, and Officer Schaefer had arrived on the scene to assist.  The circumstances indicate that Mr. Bridgewater was not a significant threat while he remained in the car, and Detective Osborne could only use the amount of force in proportion to the threat he posed.  *See Phillips*, 678 F.3d at 525 ("The officers have argued that [defendant] continued to present a potential threat

while she remained in the car because they believed the vehicle was running and could be used as a weapon. We have recognized this risk…and agree that officers were entitled to use force to remove [defendant]. But we have never suggested that any level of force is permissible to extinguish such a threat…. To the contrary, '[f]orce is reasonable only when exercised in proportion to the threat posed.'….We must view the severe force that officers used on [defendant] in light of the fact that any threat she presented had already been substantially contained. The officers had her vehicle surrounded…[and t]here was nowhere for [her] to go…. During that time, [defendant] had given no indication that she intended to harm the officers or anyone else").[3]

Based on the facts presented on summary judgment, the Court cannot conclude that no reasonable jury could find that Detective Osborne used excessive force in removing Mr. Bridgewater from the SUV. *See Abdullahi*, 423 F.3d at 773 ("since the *Graham* reasonableness inquiry nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, we have held on many occasions that summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly") (quoting *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002)) (internal quotations omitted).

### 2. *Whether Detective Osborne is Entitled to Qualified Immunity*

The parties also dispute whether Detective Osborne is entitled to qualified immunity for his actions. To determine whether a defendant is entitled to qualified immunity, courts must address two issues: "(1) whether the defendant violated the plaintiff's constitutional rights and (2) whether the right at issue was clearly established at the time of the violation." *Rooni*, 742 F.3d at

---

[3] The Court also notes that Mr. Bridgewater has submitted evidence regarding his injuries, which a jury may look to in order to determine whether the amount of force used was reasonable. *McAllister v. Price*, 615 F.3d 877, 881-82 (7th Cir. 2010) (injury "is evidence of the degree of force imposed and the reasonableness of that force").

742 (citation omitted).  "In other words, the plaintiff must show not only that [his] constitutional rights were violated, but that any reasonable official under the circumstances would have realized that [his] rights were being violated." *Easterling v. Pollard*, 528 Fed. Appx. 653, 656-57 (7th Cir. 2013).  "To be clearly established at the time of the challenged conduct, the right's contours must be 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right,' and 'existing precedent must have placed the statutory or constitutional question beyond debate.'" *Rabin v. Flynn*, 725 F.3d 628, 632 (7th Cir. 2013) (quoting *Humphries v. Milwaukee Cnty.*, 702 F.3d 1003, 1006 (7th Cir. 2012)).  The plaintiff can carry his burden to identify the clearly established right "either by identifying a 'closely analogous case that established a right to be free from the type of force the police officers used on him' or by showing 'that the force was so plainly excessive that, as an objective matter, the police officers would have been on notice that they were violating the Fourth Amendment.'" *Findlay v. Lendermon*, 722 F.3d 895, 899 (7th Cir. 2013) (quoting *Chelios v. Heavener*, 520 F.3d 678, 691 (7th Cir. 2008)).

The Court has already determined that a reasonable jury could conclude that Detective Osborn violated Mr. Bridgewater's Fourth Amendment rights, so it turns now to whether the right at issue was clearly established at the time of the violation.  Because the Court has identified fact issues that a jury must resolve, the Court cannot conclude that Detective Osborne is entitled to qualified immunity.  As the Seventh Circuit noted just this month, "it [is] clearly established that an officer may not use excessive force against an individual during an arrest," and "[i]t [is] also clearly established that using a significant level of force on a non-resisting or a passively resisting individual constitutes excessive force." *Alicea v. Thomas*, --- F.3d ----, 2016 WL 805529, *7 (7th Cir. 2016) (citing *Holmes v. Vill. of Hoffman Estates*, 511 F.3d 673, 687 (7th Cir. 2007) and *Rambo v. Daley*, 68 F.3d 203, 207 (7th Cir. 1995)).  Because, as discussed above, there is a material issue

of fact regarding the amount of force Detective Osborne used, the Court cannot conclude that Detective Osborne is entitled to qualified immunity as a matter of law. *See Alicea*, 2016 WL 805529 at *7 (reversing district court's grant of summary judgment for officer who claimed he was entitled to qualified immunity for plaintiff's excessive force claim where material issues of fact remained including the amount of force officer used); *DuFour-Dowell v. Cogger*, 152 F.3d 678, 680 (7th Cir. 1998) ("Because the facts are in hot dispute, the officers cannot seek pretrial refuge behind a claim of qualified immunity").

Accordingly, Detective Osborne's Motion for Summary Judgment on Mr. Bridgewater's § 1983 excessive force claim is denied.

### D.  State Law Battery Claim

The parties rely upon the same arguments in addressing Mr. Bridgewater's battery claim against the City as they rely upon in connection with the excessive force claim.  [*See* Filing No. 54 at 26-27; Filing No. 65 at 43-46.]  The Court need not address this claim at length.  If a jury could conclude that Detective Osborne used excessive force against Mr. Bridgewater, as the Court has found, then it could also conclude that Detective Osborne committed battery. *See Wilson v. Isaacs*, 929 N.E.2d 200, 203-04 (Ind. 2010) ("If an officer uses unnecessary or excessive force, the officer may commit the tort[] of…battery").  Accordingly, summary judgment for the City on Mr. Bridgewater's battery claim is denied.

### IV.
#### CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment, [Filing No. 53], is **GRANTED IN PART** and **DENIED IN PART**.  Additionally, Plaintiffs' Cross-Motion for Partial Summary Judgment, [Filing No. 62], is **DENIED**.  The Court **GRANTS** summary judgment

in Defendants' favor on Plaintiffs' § 1983 unlawful stop and search claim against Detectives Osborne and Kessie, Plaintiffs' state law false imprisonment claim against the City, and Plaintiffs' intentional infliction of emotional distress claim against the City. The Court **DENIES** summary judgment on all remaining claims. No partial final judgment shall issue.

The Clerk is directed to **TERMINATE** Ms. Bridgewater and Detective Kessie as parties, as the Court has granted summary judgment in favor of Defendants on all of Ms. Bridgewater's claims, and on all claims against Detective Kessie. The following claims remain for trial:

- Mr. Bridgewater's § 1983 excessive force claim against Detective Osborne; and

- Mr. Bridgewater's state law battery claim against the City.

The Court requests that the Magistrate Judge confer with the remaining parties to address the possibility of resolving the remaining claims prior to the June 13, 2016 trial scheduled in this matter.


Date:  March 22, 2016

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana


**Distribution via ECF only to all counsel of record**

- 32 -